Points Decided.

(No. 4670.   July 30, 1927.)

# UTAH STATE NATIONAL BANK, a Corporation, Appellant, v. J. W. STRINGER, Respondent.

[258 Pac. 522.]

BILLS AND NOTES — NOMINAL PAYEE, INDORSEE — FRAUD — BURDEN OF SHOWING—LENDER AND BORROWER—EXECUTION OF NOTE, EFFECT— USURY—LAW OF STATE GOVERNS.

1. Nominal payee of negotiable instrument may, in fact and in law, be shown to be really indorsee and stand in that relation to the paper.

2. Where fraud is shown in payee's procurement of note which has been negotiated and action is brought by the indorsee, burden shifts on indorsee to show to satisfaction of jury that he took instrument without notice of fraud, in view of C. S., sec. 5926.

3. Where note was executed for purpose of securing funds for purchase of bank stock, but payee did not sell stock nor buy paper belonging to one who sold stock, the relation of lender and borrower arose and note was not affected by statements and representations claimed to have been fraudulently made by others relative to value of stock purchased with its proceeds on theory that note was "tainted by fraud in the inception," since such term means the beginning, in the sense of fraud in consideration for note.

4. Note accepted and payable in Utah is governed by law of Utah authorizing written contract for interest at rate of 12 per cent per annum.

APPEAL from the District Court of the Eleventh Judicial District, for Cassia County.   Hon. T. Bailey Lee, Judge.

Publisher's Note.

2. Presumption and burden of proof in action by purchaser of bill or note, see note in 17 L. R. A. 326.

4. See 27 R. C. L. 254 et seq.

See Bills and Notes, 8 C. J., sec. 1046, p. 784, n. 61; sec. 1292, p. 984, n. 60; sec. 1348, p. 1033, n. 31 New.

Inception, 31 C. J., p. 372, n. 72.

Usury, 39 Cyc., p. 899, n. 69.

Action on promissory note. Judgment for defendant. *Reversed and remanded, with instructions to enter judgment for plaintiff.*

Merrill & Merrill, for Appellant.

When a note made payable to the plaintiff is signed by the defendant and delivered to the plaintiff the alleged fraud of a third party is no defense to the note and it is error to admit evidence of what was said by a third party to the defendant to induce him to sign the note without first showing that such third party was the agent of the plaintiff or acted with its knowledge or consent. (*Farmers Sav. Bank v. Grange,* 199 Iowa, 978, 203 N. W. 37; *Mizell v. Farmers Bank,* 180 Ala. 568, 61 So. 272; *Roth v. Donnelly Grocery Co.,* 8 Ga. App. 851, 70 S. E. 140; *Williams v. Garrett,* 32 Ga. App. 762, 124 S. E. 811; *First State Bank v. Utman,* 136 Minn. 103, 161 N. W. 398.)

If under the circumstances above recited the court concludes that the payee is a holder in due course of a negotiable note the burden of proof does not shift to the payee upon evidence of fraud because the payee does not receive the note from one having a defective title. (Brannan, Negotiable Instruments, 2d ed., p. 219; C. S., secs. 5897, 5922, 5926.)

Before a party can be relieved from the payment of his note on the grounds of fraud he must plead and prove that the representations made the basis of the charge of fraud were made with authority; that they related to material facts and that they were false and known to be false. (*Pocatello Security Trust Co. v. Henry,* 35 Ida. 321, 27 A. L. R. 337, 206 Pac. 175; *Kemmerer v. Pollard,* 15 Ida. 34, 96 Pac. 206.)

S. T. Lowe, for Respondent.

The defendant alleged and proved fraud in the inception of the note. (12 R. C. L., p. 229, sec. 2; *Swift v. Rounds,* 19 R. I. 527, 61 Am. St. 791, 35 Atl. 45, 33 L. R. A. 561;

Bigelow on Fraud, p. 484; *Goodwin v. Horne,* 60 N. H. 485; *Salter v. Aviation Salvage Co.,* 129 Miss. 217, 26 A. L. R. 987, 91 So. 340; *Cockrill v. Hall,* 65 Cal. 326, 4 Pac. 33; *Langley v. Rodriguez,* 122 Cal. 580, 68 Am. St. 70, 55 Pac. 406, 68 Pac. 70; *Brison v. Brison,* 75 Cal. 525, 7 Am. St. 189, 17 Pac. 689.)

"To constitute fraud in any case the facts misrepresented or concealed must have been material facts and they must also substantially affect the interests of the person alleged to have been defrauded." (12 R. C. L., p. 297, sec. 61.)

"Where a party alleged and proved that he was induced by material, false and fraudulent representations to enter into a contract which he would not have entered into but for such false and fraudulent representations, a contract obtained thereby is voidable." (*McLean v. Southwestern Casualty Co.,* 61 Okl. 79, 159 Pac. 660.)

When fraud is shown to have existed in the inception of a promissory note, such fraud will defeat the enforcement of the note except in the hands of an innocent purchaser. (C. S., sec. 5922.)

Whether or not the plaintiff was a holder in due course was a question for a jury. (*Smith v. Gregg,* 117 Kan. 507, 232 Pac. 217; *Phillips v. Eldridge,* 221 Mass. 103, 108 N. E. 909; 8 C. J., sec. 1376, p. 1063; *Anthony v. Mercantile Mut. Acc. Assn.,* 162 Mass. 354, 44 Am. St. 367, 38 N. E. 973, 26 L. R. A. 406; *Merchants Nat. Bank v. Haverhill Iron Works,* 159 Mass. 158, 34 N. E. 93.)

A payee of a negotiable promissory note can be a holder in due course. (*Redfield v. Wells,* 31 Ida. 415, 173 Pac. 640; *Ex parte Goldberg & Lewis,* 191 Ala. 356, 67 So. 839, L. R. A. 1915F, 1157; *Baggish v. Offendgand,* 97 Conn. 312, 116 Atl. 614.)

McNAUGHTON, Commissioner.—This action is upon a negotiable promissory note for $1,254 dated April 22, 1921, due six months later. It provides for interest at twelve per cent per annum from maturity and is payable to the Utah State National Bank at its banking-house in Salt Lake City,

Utah. Defendant claims fraud in its procurement and no consideration as defenses, and also sets up the claim of usury. The nature of the case has required a thorough examination of all the evidence, but in the opinion only a general statement will be attempted.

From the testimony, it appears that on January 17, 1921, the Burley State Bank and the Bank of Commerce of the same place suspended business. The mayor of the city thereupon called a mass meeting, and at this meeting a citizens' committee was appointed to work upon a plan to relieve the situation. The work of the citizens' committee at the start contemplated the reopening or reorganization of the Bank of Commerce. The committee solicited aid from certain bankers in Council· Bluffs, Iowa, and also from the Utah State National Bank. After the citizens' committee had discussed the situation with certain bankers representing the interests of Council Bluffs people who were stockholders in the Bank of Commerce, and after advising with the commissioner of finance, and also, with the officers of the Utah State National Bank, it adopted a plan which was pursued and which in general was as follows:

A bank to be known as the Commercial State Bank, hereinafter referred to as the new bank, was to be organized with a capital of $100,000 and with $20,000 surplus. The $120,000 of new money thought to be necessary to finance the plan was to be raised by selling the stock at $120 per share. By this plan, the new bank was to take over the assets of both the closed banks and in consideration thereof was to assume liability of the closed banks to their depositors to the extent of eighty-five cents on the dollar; and also, was to assume their obligations to other banks, excepting the obligation of the Burley State Bank to the Federal Reserve Bank. The Burley State Bank, when it closed, was owing the Federal Reserve Bank, $545,468; and the latter held notes belonging to the Burley State Bank in the sum of $719,317, as collateral. The difference between the amount of this debt and the value of the notes pledged was

called, and is referred to herein as the Federal Reserve equity. The only interest in those notes which the Burley State Bank could assign to the new bank was this equity. Ten per cent of the deposits in the closed banks was to be paid at once, the balance of the eighty-five per cent assumed was to be deferred; and also the indebtedness to other banks was to be deferred.

Plaintiff, Utah State National Bank, had no interest in either of the defunct banks and no interest in the new bank other than holding some of its stock as collateral to the note in question and other similar notes. The Citizens' committee procured the promise of the Utah bank to assist in the organization of the new bank by loaning as much as $90,000 to persons purchasing stock in the new bank upon their notes provided such persons could and would furnish satisfactory property statements, and provided further, that persons so borrowing from it would further secure the loan by a pledge of the stock as collateral to their notes.

After the books of the closed banks had been audited by the commissioner of finance and also by the auditor of the Utah State National Bank, another meeting was called at which the commissioner of finance, the auditor of the Utah State National Bank, certain Council Bluffs bankers who were aiding the committee, and Mr. Langlois of the citizens' committee, made speeches, announcing that a new bank was being organized and claiming that it would have the support of the Utah bank to assist in money and by management in organizing it and in running it; that no bad assets would be accepted from either of the closed banks; and that stock in it would be a good and sound investment. Defendant heard the speech of Mr. Langlois, and also that of Mr. Tinley, of Council Bluffs, but did not hear the others.

Subscriptions for the new stock were taken at this meeting, but though defendant was a depositor in the Burley State Bank, he did not subscribe for any of the stock of the new bank at that time. Later Mr. Langlois of the Citizens' committee saw him and urged him to subscribe for the stock,

as did also Mr. Rich who had been an officer in the Burley State Bank. It is testified that these men represented to him that the stock was a good investment at $120; that the Utah State National Bank was financially behind the new bank; that it would scrutinize the assets taken into the new bank; that only good assets would be taken; that it would send an officer to operate the bank; that it would be one of the strong banks of the country; and that the investment was a good one and one that the defendant ought to make as one of the leading citizens of the town. After the conference with these men, defendant subscribed for ten shares of the stock at $120 per share. He made out a property statement to the Utah State National Bank and executed the note in question. The note and property statement were sent to Salt Lake City and the Utah bank accepted them and sent its cashier's check payable to defendant to Burley for him. He indorsed the cashier's check over to the new bank, and received ten shares of its stock which he assigned in writing to the Utah State National Bank as collateral security to the note, with authority in the Utah bank to vote the stock. The new bank closed in November, and thereupon its stock became valueless.

It appears in the testimony that at the time the new bank closed $150,000 of the assumed obligations were about to fall due, and that little had been realized from the assets assigned to it by the old banks. It also appears that the Utah bank, the plaintiff, had refused to finance the new bank by loaning it this amount. The testimony also shows that the assets taken into the new bank proved bad; the Federal Reserve equity especially so. The citizens' committee and the bank examiner had passed upon the assets which were taken into the new bank. It appears they could not agree unanimously on the asset known as the Federal Reserve equity, which was being offered as an asset by the Burley State Bank at approximately $100,000. This matter was referred by the committee and the commissioner of finance to the officers of the Utah State National Bank, and they recommended receiving it upon the officers of the

Burley State Bank executing a bond in the sum of $20,000, securing the Commercial State Bank against loss of principal in that amount, and on assignment by the Burley State Bank, or its officers, of all rents from the building which it owned and in which the new bank was located, as a further guarantee of payment of interest as it became due on the notes included in that equity.

At the trial, the theory of defendant was that there were misrepresentations amounting to fraud in the procurement of the note, and that, even if privity or knowledge of the fraud could not be shown in the Utah State National Bank, nevertheless, it, as a matter of fact, took the note by negotiation, and that when fraud in the inception of the note appeared, plaintiff had the burden of showing to the satisfaction of the jury that it had no notice of the alleged fraud. The verdict of the jury was for defendant.

On appeal, plaintiff claims error under sixteen assignments. By part of these, it is claimed error was committed in receiving in evidence statements of third parties not representing the Utah bank and in no way binding upon it. By other assignments, appellant points out wherein it is claimed the evidence was insufficient to justify the verdict or to support the judgment and claims error in the court's refusal to grant appellant's motion for directed verdict.

We think no fraud or knowledge of fraud was shown on the part of the Utah State National Bank or any of its officers or agents in the transaction. The acts and the statements relied upon by defendant as a defense were made by others who were not interested in the loan made to defendant, but were interested only in procuring his subscription for stock in the new bank, then in process of organization. If we assume that the statements and representations made by the citizens' committee and others in the organization of the new bank at Burley were such as to constitute fraud, the question arising in the case is: What relation, if any, that fraud had to the transaction. This requires a determination as to whether or not the real and

virtual consideration for the note in question was the money represented by the cashier's check which the Utah bank parted with for it, or the ten shares of stock in the newly organized bank, and, therefore, whether the relation of the Utah State National Bank to the note in question was that of an indorsee, rather than an immediate party. The theory of the defense is that the plaintiff should be treated as an indorsee accepting paper tainted with fraud.

[1, 2] Under the decision in the case of *Redfield v. Wells,* 31 Ida. 415, 173 Pac. 640, in this jurisdiction, a nominal payee of a negotiable instrument may in fact and in law be shown to be really an indorsee and stand in that relation to the paper. And it is settled by the decisions that where fraud is shown in the payee's procurement of a note which has been negotiated and action is brought by the indorsee, the burden shifts to the indorsee to show to the satisfaction of the jury that he took the instrument without notice of the fraud. A fair example of this line of decisions is found in *Wright v. Spencer,* 39 Ida. 60, 226 Pac. 173, wherein the court says:

"From the above sections, and particularly section 5926 as construed in *First National Bank v. Hall, supra,* ·we conclude that, when appellant alleged and proved that the title of the corporation which negotiated the instrument to respondent was defective, because of the fraud practiced, the burden was on respondent to prove that he acquired title to the note as a holder in due course. This included the burden of proving that, when it was negotiated to him, he had no notice of the infirmity in the instrument resulting from the fraud practiced by the corporation which transferred it back to him, lack of such notice being an element of the statutory definition of a holder in due course. Having proved the fraud, the burden was not upon appellant to prove that respondent took with notice of the fraud, but the burden was on respondent to prove that he took without notice.

The authority for these decisions is found in C. S., sec. 5926, which reads:

"Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired title as a holder in due course. But the last mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

It will be seen from an examination of C. S., sec. 5926, upon which the doctrine announced is based, that the rule contemplates one who has acquired title from some person other than the maker.

In this case, however, the note was delivered by the maker for the payee, and accepted from the maker by the payee. That is to say, no person between the maker and the payee had any title or interest in the note. The only title which the plaintiff acquired, or claims to have acquired, was that of the maker. Hence, there was no intermediate title which could be affected by fraud of third parties, thus casting a burden on plaintiff to show that it had no notice of it.

[3] Defendant's case is based mainly upon his persistent claim that the representations and statements of the committee and others inducing the defendant to take stock in the new bank tainted the note with fraud in its inception. We do not think this position tenable, for "by fraud in the inception" is meant, the beginning, in the sense of fraud in the consideration for the note. The consideration for the note in question was not the stock in the Commercial State Bank which was purchased with the proceeds of the note, but the sole consideration was the cashier's check. The Utah bank did not sell defendant stock of the Commercial State Bank, neither did it buy paper which nominally or in reality belonged to one who had sold him stock. It is our view that the evidence shows without contradiction that the true actual relation between plaintiff and defendant was purely the relation of a lender to a borrower of money; that the statements and representations claimed to have been

fraudulently made in no manner entered into the consideration for the note, but constitute a separate and distinct matter between defendant and the Commercial State Bank or those making the statements. These statements have nothing to do with the relations between the Utah State National Bank and defendant, Stringer, and were immaterial to this action upon the note. (*Farmers Sav. Bank v. Grange*, 199 Iowa, 978, 203 N. W. 37; *Mizell v. Farmers Bank*, 180 Ala. 568, 61 So. 272; *Roth v. Donnelly Grocery Co.*, 8 Ga. App. 851, 70 S. E. 140; *Williams v. Garrett*, 32 Ga. App. 762, 124 S. E. 811; *First State Bank v. Utman*, 136 Minn. 103, 161 N. W. 398.)

[4] The note in question was a Utah note, accepted and payable at Salt Lake City, and we must hold that the law of Utah which authorizes a written contract for interest at the rate of twelve per cent per annum governs. (*Zimmerman v. Brown*, 30 Ida. 640, 166 Pac. 924.)

The Utah State National Bank being the nominal and true payee of the note for a consideration of $1,200 and no fraud chargeable against it being shown, we recommend that the cause be reversed and remanded to the district court with instructions to enter judgment for plaintiff in the amount of the note with interest, together with an attorney's fee to be fixed by the court, not to exceed the amount claimed in the complaint.

Varian and Brinck, CC., concur.

The foregoing is approved as the opinion of the court, and the judgment is reversed and remanded to the district court, with instructions to enter judgment for plaintiff in the amount of the note with interest, together with an attorney's fee to be fixed by the court, not to exceed the amount claimed in the complaint.

Wm. E. Lee, C. J., and Budge, Givens and Taylor, JJ., concur.